**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

**TRAILER BRIDGE, INC.**                                    **CIVIL ACTION**

**VERSUS**                                                          **CASE NO. 22-5358**

**LOUISIANA INTERNATIONAL MARINE, LLC**          **SECTION: "G"(5)**

**FINDINGS OF FACT, CONCLUSIONS OF LAW AND REASONS FOR JUDGMENT**

     This matter came before this Court for trial without a jury on December 16, 2024. Plaintiff Trailer Bridge, Inc. ("Trailer Bridge") brings this action challenging the validity of Defendant Louisiana International Marine, LLC's ("LIM") maritime liens for towage and related necessaries against two barges owned by Plaintiff, namely the ATLANTA BRIDGE and MEMPHIS BRIDGE, *in rem*, for the principal amount of $1,917,785.72.[1] The substantive law applicable to this case is the Commercial Instruments and Maritime Liens Act ("CIMLA"), 46 U.S.C. § 31301, *et seq.*

     The Court has carefully considered the testimony of all of the witnesses and the exhibits entered into evidence during the trial, as well as the record. After reviewing all of the evidence and pursuant to Federal Rule of Civil Procedure Rule 52(a), the Court issues the following findings of fact and conclusions of law. To the extent that any finding of fact may be construed as a conclusion of law, the Court hereby adopts it as such and to the extent that any conclusion of law constitutes a finding of fact, the Court hereby adopts it as such.

---

[1] Rec. Doc. 1.

# I. Background

## A.    *Factual Background*

On December 20, 2022, Plaintiff filed a complaint in this Court against Defendant seeking declaration that the claims of lien asserted by Defendant are invalid.[2] On January 23, 2023, Defendant filed an answer and counterclaim against Plaintiff seeking recognition of the liens and judgment *in rem* against the barges.[3]

According to the Complaint, Plaintiff owned two deck barges, ATLANTA BRIDGE and MEMPHIS BRIDGE.[4] On August 4, 2020, Plaintiff and Work Cat Florida, LLC ("Work Cat") executed a BIMCO Standard Barge Charter Party Agreement ("the Trailer Bridge/Work Cat charter agreement") for the time charter of the barges to Work Cat.[5] The charter agreement allegedly contained a no-lien and indemnity provision.[6] The Complaint alleges that a copy of the charter agreement was maintained in the line lockers of the ATLANTA BRIDGE and MEMPHIS BRIDGE and was available upon request.[7]

On November 12, 2020, Work Cat and Defendant entered into two identical BIMCO Supplytime 2005-time charter party agreements for certain offshore service vessels (collectively "the LIM/Work Cat charter agreements"), namely the LA COMMANDER and the LA INVADER owned by Defendant.[8]

---

[2] Rec. Doc. 1 at 11.

[3] Rec. Doc. 5.

[4] Rec. Doc. 1 at 2.

[5] *Id.* at 3.

[6] *Id.*

[7] *Id.*

[8] *Id.*

Beginning in January 2021, Work Cat, pursuant to the LIM/Work Cat charter agreements, utilized the services of the LA COMMANDER and the LA INVADER to perform various services including towage of the chartered barges owned by Plaintiff.[9] According to the Complaint, Plaintiff was not a part of, did not consent to, and lacked knowledge of these arrangements.[10]

Defendant regularly invoiced Work Cat for payment for the services rendered from January 16, 2021 through June 18, 2021.[11] On May 18, 2021, Work Cat filed for Chapter 11 Bankruptcy in the United States Bankruptcy Court for the Middle District of Florida – Tampa Division.[12] On June 22, 2021, Work Cat converted its bankruptcy proceedings from Chapter 11 to Chapter 7.[13]

On May 25, 2021, Defendant filed a proof of claim in the Work Cat bankruptcy proceedings for the unpaid invoices to Work Cat totaling $1,364,214.17.[14] Defendant alleged that this amount was for "towage services and supplies" rendered to Work Cat for the use of the LA COMMANDER and LA INVADER.[15]

On June 4, 2021, Defendant filed two claims of lien with the National Vessel Documentation Center ("NVDC") against the ATLANTA BRIDGE for $1,264,214.16 and against

---

[9] *Id.* at 4.

[10] *Id.*

[11] *Id.*

[12] *Id.* at 5.

[13] *Id.*

[14] *Id.*

[15] *Id.* at 6.

the MEMPHIS BRIDGE for $1,362,214.16.[16] Both claims of lien allege a maritime lien for necessaries for towage against the respective barges.[17]

On August 1, 2022 and November 28, 2022, Plaintiff entered into Purchase and Sale Agreements to sell the MEMPHIS BRIDGE and the ATLANTA BRIDGE.[18] Both agreements require Plaintiff to indemnify and defend the purchasers.[19] On November 30, 2022, Defendant sent a Notice of Lien and Demand for Payment to the purchaser of the MEMPHIS BRIDGE.[20] On December 16, 2022, the purchaser made demand to Plaintiff seeking defense and indemnity against the claim asserted by Defendant.[21]

**B.    *Procedural Background***

On January 8, 2024, Defendant filed a Motion for Summary Judgment seeking summary judgment in its favor recognizing the validity of the maritime liens for towage and related necessaries against the two barges.[22] On June 13, 2024, the Court denied summary judgment, finding that (1) Defendant provided necessaries for the barges; (2) Defendant was not entitled to fuel costs; and (3) a presumption exists that Defendant relied on the credit of the vessel.[23] The Court concluded that genuine issues of material fact existed as to whether Defendant intended to

---

[16] *Id.*

[17] *Id.*

[18] *Id.* at 7.

[19] *Id.*

[20] *Id.*

[21] *Id.* at 8.

[22] Rec. Doc. 33.

[23] Rec. Doc. 43.

forego the lien.[24]

A trial without a jury was held from December 16, 2024 through December 17, 2024.[25] At the close of Plaintiff's case-in-chief, Defendant moved for Judgment of Partial Findings that Defendant did not have actual notice of the no-lien provision, which was taken under advisement.[26] At the close of Plaintiff's case-in-chief, Defendant moved for partial judgment pursuant to Federal Rule of Civil Procedure 52(c), that Plaintiff had not met its burden of proving actual notice.[27] The Court took this matter under advisement.[28] On day two of trial, the Court ruled that Defendant did not have actual notice of the no-lien clause.[29] After Defendant rested, Plaintiff moved for Judgment as a Matter of Law on the claims asserted against Plaintiff *in personam*.[30] Defendant conceded that it does not intend to assert a claim against Plaintiff *in personam*.[31] Second, Plaintiff moved for Judgment as a Matter of Law in its favor finding that the maritime liens asserted by Defendant were invalid.[32] This issue was taken under advisement.[33] Third, Plaintiff made an oral motion for reconsideration of the Court's ruling that Defendant did not have actual notice of the no-lien clause, which was taken under advisement.[34] Fourth, Plaintiff moved for Judgment as a Matter of Law as

---

[24] *Id.* at 27–28.

[25] Rec. Docs. 88–89.

[26] Rec. Doc. 88.

[27] Trial Transcript, Day One.

[28] *Id.*

[29] Rec. Doc. 89.

[30] Trial Transcript, Day Two.

[31] *Id*.

[32] *Id*.

[33] *Id*.

[34] *Id.*

it relates to whether Defendant's liens were incorrect and invalid, which was taken under advisement.[35] Fifth, Plaintiff moved for Judgment as a Matter Law in its favor finding that LIM's claims were discharged in bankruptcy court, which was denied by the Court.[36] Sixth, Plaintiff moved for Judgment as a Matter of Law as to the reasonableness of the claim of lien asserted by LIM, which was denied.[37] Seventh, Plaintiff moved for Judgment as a Matter of Law in its favor finding that LIM did not rely on the credit of the vessels, which was denied.[38]

## II. Findings of Fact

1. Trailer Bridge, Inc. is a corporation organized and existing under the laws of the State of Delaware with its principal place of business located in Florida.[39] Trailer Bridge, Inc. is a supply chain company that specializes in logistics.[40]

2. Louisiana International Marine, LLC is a limited liability company organized under the laws of the State of Louisiana.[41]

3. The MEMPHIS BRIDGE is a flat deck cargo barge bearing U.S. official number 1067458.[42] At all relevant times, the MEMPHIS BRIDGE was owned by Trailer Bridge, Inc.[43]

---

[35] *Id.*

[36] *Id.*

[37] *Id.*

[38] *Id.*

[39] Uncontested fact, Rec. Doc. 87 at 2.

[40] Trial Day One, Plaintiff's Opening Statement.

[41] Uncontested fact, Rec. Doc. 87 at 2.

[42] Rec. Doc. 1 at 2.

[43] Uncontested fact, Rec. Doc. 87 at 5.

4.  The ATLANTA BRIDGE is a flat deck cargo barge bearing U.S. official number 1067457.[44] At all relevant times, the ATLANTA BRIDGE was owned by Trailer Bridge, Inc.[45]

5.  Work Cat and Trailer Bridge entered into a BIMCO Standard Barge Charter Party Agreement ("Work Cat/Trailer Bridge Charter") on August 4, 2020.[46] The Work Cat/Trailer Bridge charter agreement contained a no-lien and indemnity clause.[47] The no-lien and indemnity clause states, "The Charters shall not suffer nor permit to be continued, any lien or encumbrance incurred by them or their agents, which might have priority over the title and interest of the Owners in the Barge."[48]

6.  LIM was a contractor for Work Cat. Work Cat engaged LIM to pull the barges [MEMPHIS BRIDGE and ATLANTA BRIDGE] from Tampa, Florida to Brownsville, Texas and back to Tampa, Florida.[49]

7.  It was customary for Work Cat to maintain binders upon the vessel towing the respective barge. Said binders usually contain a copy of the charter agreement.[50]

8.  Work Cat's CEO, Christopher Raley, did not perform an inventory of the contents of the binders upon the respective tugboats which towed the MEMPHIS BRIDGE and

---

[44] Rec. Doc. 1 at 2.

[45] Uncontested fact, Rec. Doc. 87 at 5.

[46] Uncontested fact, Rec. Doc. 87 at 5.

[47] Trial Day One, Direct Examination of Christopher Raley.

[48] Plaintiff's Trial Exhibit 1.

[49] Trial Day One, Direct Examination of Christopher Raley.

[50] Trial Day One, Direct Examination of Christopher Raley.

ATLANTA BRIDGE.[51]

9. On November 12, 2020, Work Cat chartered two tugboats owned by LIM, the LA INVADER and LA COMMANDER, via two identical BIMCO Supplytime 2005 Time Charter Part Agreements for Certain Offshore Service Vessels ("Work Cat/LIM Charter").[52]

10. LIM invoiced Work Cat a daily rate for towage services of the LA INVADER and LA COMMANDER to work as directed with liner service between Tampa and Brownsville.[53] The invoices include dates of service beginning from December 11, 2020 through June 18, 2021.[54] The LA MADONNA was formerly used in connection with the towage services but was substituted by the LA INVADER.[55]

11. The LA INVADER was used to tow the MEMPHIS BRIDGE, and the LA COMMANDER was used to tow the ATLANTA BRIDGE.[56]

12. LIM did not rely on Work Cat as the sole source of recovery in the event LIM was not paid. LIM acknowledged it also had the opportunity to lien the cargo, the equipment, or the barge for its protection.[57]

13. On December 20, 2020, Christopher Raley, CEO of Work Cat, sent an email to Anthony Roberts, LIM's operations manager, which included the Work Cat/Trailer Bridge charter

---

[51] Trial Day One, Direct Examination of Christopher Raley.

[52] Plaintiff's Trial Exhibit 2.

[53] Trial Day One; Direct Examination of Christopher Raley; Plaintiff's Trial Exhibit 3.

[54] Defendant's Trial Exhibits 1 and 2; Trial Day One, Cross Examination of Christopher Raley; Trial Day One, Direct Examination of Anthony Roberts; Trial Day One, Cross Examination of Anthony Roberts.

[55] Trial Day One, Cross Examination of Christopher Raley.

[56] Defendant's Trial Exhibit 3.

[57] Trial Day One, Cross Examination of Anthony Roberts.

agreement.[58]

14. Anthony Roberts, LIM's operations manager, did not read the no-lien provision contained in the Work Cat/Trailer Bridge charter agreement.[59] No one discussed with Anthony Roberts the no-lien clause contained in the Work Cat/Trailer Bridge charter agreement. Anthony Roberts was not aware of the no-lien clause.[60]

15. Anthony Roberts testified that Christopher Raley sent over a copy of the Work Cat/Trailer Bridge charter agreement because Christopher Raley was unhappy with having to pay Trailer Bridge in advance, and he wanted Anthony Roberts to review the contract regarding the advance payment.[61]

16. Barges do not require fuel. Fuel was provided for the tugboats.[62]

17. Work Cat contracted with Glander International Bunkering for fuel and lube. Glander International Bunkering invoiced Work Cat for fuel and lube.[63]

18. Glander International Bunkering asserted a lien against LIM's vessels for nonpayment of fuel and lube.[64] LIM paid to release the liens.[65] Glander assigned its bankruptcy claim against Work Cat to LIM after LIM paid to release the liens.[66]

---

[58] Trial Day One, Direct Examination of Christopher Raley.

[59] Trial Day One, Direct Examination of Anthony Roberts.

[60] Trial Day One, Cross Examination of Anthony Roberts.

[61] Trial Day One, Cross Examination of Anthony Roberts.

[62] Trial Day One, Direct Examination of Christopher Raley.

[63] Trial Day One, Cross Examination of Christopher Raley.

[64] Trial Day One, Cross Examination of Anthony Roberts.

[65] Trial Day One, Cross Examination of Anthony Roberts.

[66] Trial Day Two, Direct Examination of Elizabeth Autin.

19. On May 18, 2021, Work Cat filed for Chapter 11 bankruptcy in the United States Bankruptcy Court for the Middle District of Florida – Tampa Division.[67]

20. On May 25, 2021, LIM filed a proof of claim in the Work Cat bankruptcy proceeding for unpaid invoices for towage services and supplies totaling $1,364,214.17.[68]

21. On June 4, 2021, LIM filed two notices of lien claims with the National Vessel Documentation Center ("NVDC") – one against the ATLANTA BRIDGE in the amount of $1,362,214.16, and another against the MEMPHIS BRIDGE in the amount of $1,362,214.16.[69]

22. The notice of liens against both the ATLANTA BRIDGE and the MEMPHIS BRIDGE state that the date the liens were established is January 16, 2021.[70]

23. The notice of lien in the amount of $1,364,214.17 asserted against the ATLANTA BRIDGE was reflective of the total unpaid invoices in connection with both the ATLANTA BRIDGE and the MEMPHIS BRIDGE.[71]

24. The notice of lien in the amount of $1,364,214.17 asserted against the MEMPHIS BRIDGE was reflective of the total unpaid invoices in connection with both the ATLANTA BRIDGE and the MEMPHIS BRIDGE.[72]

25. On June 22, 2021, Work Cat converted its bankruptcy proceedings from Chapter 11 to

---

[67] Uncontested fact, Rec. Doc. 87 at 5.

[68] Uncontested fact, Rec. Doc. 87 at 6; Plaintiff's Trial Exhibit 5.

[69] Uncontested fact, Rec. Doc. 87 at 6; Plaintiff's Trial Exhibit 6.

[70] Trial Day One, Cross Examination of Christopher Raley; Plaintiff's Trial Exhibit 6; Plaintiff's Trial Exhibit 7.

[71] Trial Day One, Direct Examination of Anthony Roberts.

[72] Trial Day One, Direct Examination of Anthony Roberts.

Chapter 7.[73]

26. On August 1, 2022, Trailer Bridge entered into an agreement to sell the MEMPHIS BRIDGE. On November 28, 2022, Trailer Bridge entered into an agreement to sell the ATLANTA BRIDGE.[74]

27. Following the notice of liens asserted by LIM against the ATLANTA BRIDGE, a potential buyer backed out of a prospective sale to buy the ATLANTA BRIDGE.[75]

28. On November 20, 2023, Trailer Bridge and LIM entered into a Lien Escrow Agreement.[76]

### III. Conclusions of Law

***A.   Whether LIM is Entitled to a Maritime Lien Against the MEMPHIS BRIDGE and ATLANTA BRIDGE***

To be entitled to a maritime lien under the Commercial Instruments and Maritime Liens Act ("CIMLA"), LIM must show that it provided necessaries to the vessels "on the order of the owner or a person authorized by the owner."[77] The CIMLA defines "necessaries" as including "repairs, supplies, towage, and the use of a dry dock or marine railway…"[78] CIMLA provides that the following individuals are presumed to have authority to procure necessaries for a vessel:

1. The owner;
2. The master;
3. A person entrusted with the management of the vessel at the port of supply; or
4. An officer or agent appointed by-
   i. The owner;
   ii. A charterer;
   iii. An owner pro hac vice;

---

[73] Uncontested fact, Rec. Doc. 87 at 6.

[74] Uncontested fact, Rec. Doc. 87 at 6.

[75] Trial Day One, Direct Examination of Joseph Kvasnicka.

[76] Plaintiff's Trial Exhibit 9.

[77] 46 U.S.C. § 31341, et seq.

[78] 46 U.S.C. § 31301(4).

iv.  An agreed buyer in possession of the vessel.[79]

Under the CIMLA, a person providing necessaries to a vessel on the order of the owner or a person authorized by the owner (1) has a maritime lien on the vessel; (2) may bring a civil action in rem to enforce the lien; and (3) is not required to allege or prove in the action that credit was given to the vessel.[80]

### 1.    Whether LIM Provided Necessaries to the Barges

First, the Court finds that the evidence presented at trial demonstrates that LIM provided necessaries to the MEMPHIS BRIDGE and the ATLANTA BRIDGE on the order of Work Cat, the charterer. The CIMLA defines "necessaries" as including "repairs, supplies, towage, and the use of a dry dock or marine railway…"[81] Charterers, like Work Cat, "are presumed to have authority to procure necessaries for a vessel."[82] The evidence presented shows that LIM provided towage services for the MEMPHIS BRIDGE and the ATLANTA BRIDGE as directed by Work Cat in connection with liner services between Tampa and Brownsville from December 2020 through June 2021. Christopher Raley, Work Cat's CEO, and Anthony Roberts, LIM's Operations Manager, testified that LIM provided towage and invoiced Work Cat a daily rate for towage services of the LA INVADER and LA COMMANDER which towed the MEMPHIS BRIDGE and ATLANTA BRIDGE to work as directed with liner service between Tampa and Brownsville.[83] For these reasons, the Court finds that LIM provided necessaries to the MEMPHIS BRIDGE and

---

[79] *Id.*

[80] 46 U.S.C. § 31342(a).

[81] 46 U.S.C. § 31301(4).

[82] 46 U.S.C. § 31341(a).

[83] Trial Day One; Direct Examination of Christopher Raley; Trial Day One, Direct Examination of Anthony Roberts.

the ATLANTA BRIDGE.

### 2.    Whether LIM had Actual Knowledge of the No-Lien Clause

Next, the Court finds that Trailer Bridge has not met its burden of showing that LIM had actual knowledge of the no-lien clause contained in the Work Cat/Trailer Bridge charter agreement. As stated above, charterers, like Work Cat, "are presumed to have authority to procure necessaries for a vessel."[84] Trailer Bridge may rebut this presumption by demonstrating that LIM had actual knowledge of the no lien clause.[85] Federal courts have uniformly construed no lien clauses in charters as without effect to bar a lien in favor of a supplier, unless it is proved that, at the time the contract was entered into, the supplier had *actual knowledge* of the prohibition of lien clause.[86] "The party seeking to bar a supplier's maritime lien has the burden of proving that the supplier actually knew of a no lien clause in the charter party or other contract."[87] Actual knowledge that the vessel is under charter will not bar a lien unless the prohibition of lien clause itself is brought to the supplier's attention.[88]

---

[84] 46 U.S.C. § 31341(a).

[85] *World Fuel Servs. Trading, DMCC v. M/V Hebei Shijiazhuang*, 12 F. Supp. 3d 792, 808 (E.D. Va. 2014) (quoting Belcher Oil Co. v. M/V Gardenia, 766 F.2d 1508, 1512 (11th Cir. 1985)).

[86] *Bomin Greece S.A. v. M/V Genco Success*, 2017 AMC 1716 (N.D. N.Y. 2017); *Cal Dive Offshore Contractors, Inc. v. M/V Sampson*, 2017 AMC 1871 (S.D. N.Y. 2017); *World Fuel Services Trading, DMCC v. Hebei Prince Shipping Co.*, 783 F.3d 507, 522 (4th Cir. 2015); *Stevens Shipping & Terminal v. Japan Rainbow II MV*, 334 F.3d 439, 2003 AMC 1647 (5th Cir. 2003); *Lake Union Drydock Co. v. M/V Polar Viking*, 446 F. Supp. 1286, 1978 AMC 1477 (W.D. Wash. 1978); *Gulf Oil Trading Co. v. M/V Caribe Mar*, 757 F.2d 743, 1985 AMC 2726 (5th Cir. 1985); *TTT Stevedores of Texas, Inc. v. M/V Jagat Vijeta*, 696 F.2d 1135, 1983 AMC 1980 (5th Cir. 1983); *see also Memphis Boat Refueling Service, Inc. v. Ole Man River Towing, Inc.*, 550 F. Supp. 939 (E.D. Mo. 1982); *Redcliffe Americas Ltd. v. M/V Tyson Lykes*, 806 F. Supp. 69, 1993 AMC 1027 (D. S.C. 1992), reversed on other grounds 996 F.2d 47, 1993 AMC 2294 (4th Cir. 1993); *American Oil Trading, Inc. v. M/V Sava*, 47 F. Supp. 2d 348, 1999 AMC 1729 (E.D. N.Y. 1999).

[87] *Id.*

[88] *See Ramsay Scarlett & Co., Inc. v. S.S. Koh Eun*, 462 F. Supp. 277, 1979 AMC 970 (E.D. Va. 1978); *Belcher Oil Co. v. M/V Gardenia*, 766 F.2d 1508, 1986 AMC 1745 (11th Cir. 1985); *Ferromet Resources, Inc. v. Chemoil Corp.*, 5 F.3d 902, 1995 AMC 157 (5th Cir. 1993).

For example, in *Gulf Oil Trading Co. v. M/V CARIBE MAR*,[89] the Fifth Circuit found that a supplier of necessaries had actual notice of a prohibition of lien clause after the supplier received a letter specifically advising them of the prohibition of lien clause. Similarly, in *Stevens Shipping & Terminal Co. v. M/V JAPAN RAINBOW II*, the district court found actual knowledge of the no-lien provision after the managing agent for the vessel "faxed a two-page Notice of the prohibition of liens clause contained in the subject charter party" to the supplier.[90] In *Belcher Oil Co v. M/V Gardenia,* the Eleventh Circuit found that a supplier of necessaries had actual notice of a prohibition of lien clause when its representative was advised of the prohibition of lien clause by the charterer's agent.[91] In *Gulf Oil Trading Co. v. M/V Freedom,* the district court found no actual notice where bunker receipts were stamped with a prohibition of lien notice, were received by the bunker supplier's billing department, and "there [was] no evidence that anyone at [the bunker supplier's company] noticed the no-lien stamp on the one prior invoice which contained it or that any clerk understood its meaning."[92]

There has been no evidence presented that the prohibition of lien clause was brought to LIM's attention. Anthony Roberts testified that Christopher Raley emailed him a copy of the Work Cat/Trailer Bridge charter agreement, but the email failed to specifically reference the prohibition of lien clause.[93] Anthony Roberts testified that Christopher Raley emailed him the Work Cat/Trailer Bridge charter agreement for the specific purpose of reviewing the advance payment provision. Anthony Roberts testified that he had no knowledge of the no-lien clause, that he did

---

[89] 757 F.2d 743 (5th Cir. 1985).

[90] 2002 WL 1339145 at *2 (E.D. La. June 17, 2002), *aff'd*, 334 F.3d 439 (5th Cir. 2003).

[91] 766 F.2d 1508 (11th Cir. 1985).

[92] 1985 WL 4787, at *3 (D. Or. July 25, 1985).

[93] Plaintiff's Trial Exhibit 4.

not read the Work Cat/Trailer Bridge charter agreement in full, nor did he read the no-lien provision contained in the charter agreement. Anthony Roberts further testified that no one discussed the no-lien clause with him. "It is not enough for [the supplier] to have knowledge that the [vessel] was under charter, there must be actual knowledge of the no-lien provision in the charter party."[94] As such, the Court finds that LIM did not have actual knowledge of the no-lien clause.

### 3.      Whether LIM Relied on the Credit of the Vessel

Third, the Court finds that Trailer Bridge has not met its burden of showing that LIM purposefully intended to forego the lien. As stated above, LIM provided necessaries to the vessels, and thus, a presumption exists that LIM relied on the credit of the vessels. If the burden is carried that goods or services qualifying for a lien were furnished to a vessel, Section 31342(a)(3) creates a presumption of reliance on the credit of the vessel, and there is no need to allege or prove this fact.[95] The party opposing the lien rather has the burden of negating this by establishing that the personal credit of the owner or charterer was solely relied upon.[96] To meet this burden, evidence must be submitted that the supplier of goods or services purposefully intended to forego the lien.[97] The Fifth Circuit has "consistently held that it is necessary that a litigant arguing for such a waiver prove that the creditor *deliberately intended* 'to forego the valuable privilege which the law accords and look solely to the owner's personal credit.'"[98]

---

[94] *Gulf Oil Trading Co. v. M/V Freedom*, No. CIV. 84-425FR, 1985 WL 4787, at *2 (D. Or. July 25, 1985).

[95] Thomas J. Schoenbaum, *Admiralty and Maritime Law* § 9:3 Liens for "necessaries": the Commercial Instruments and Maritime Liens Act (2023).

[96] *TTT Stevedores of Texas, Inc. v. M/V Jagat Vijeta*, 696 F.2d 1135 (5th Cir. 1983).

[97] *Maritrend, Inc. v. Serac & Co. (Shipping). Ltd*, 348 F.3d 469 (5th Cir. 2003).

[98] *Gulf Oil Trading Co., a Div. of Gulf Oil Co. v. M/V CARIBE MAR*, 757 F.2d 743, 750 (5th Cir. 1985).

Trailer Bridge failed to present evidence that LIM solely relied on the credit of Work Cat. To the contrary, Anthony Roberts testified that LIM did not rely on Work Cat as the sole source of recovery in the event LIM was not paid. Anthony Roberts acknowledged LIM had the opportunity to lien the cargo, the equipment, or the barge for its protection. Thus, Trailer Bridge fails to rebut the presumption that LIM relied on the credit of the vessels.

For the foregoing reasons, the Court finds that LIM is entitled to a maritime lien against the MEMPHIS BRIDGE and the ATLANTA BRIDGE under the CIMLA.

**B.    *Trailer Bridge's Conversion Claim***

Trailer Bridge brings a claim against LIM for conversion. "Under the general maritime law, as under the common law of torts, a person may be liable for certain intentional wrongs, such as conversion[.]"[99] The Fifth Circuit looked to the "landside context" for this maritime tort to define it as "the unlawful and wrongful exercise of dominion, ownership or control over the property of another, to the exclusion of the same rights by the owner."[100] The Court finds that Trailer Bridge has failed to show a prima facie case for conversion. Because the Court has found that LIM is entitled to a maritime lien against the ATLANTA BRIDGE and MEMPHIS BRIDGE under the CIMLA, LIM's exercise of dominion, ownership or control was not unlawful. For these reasons, the Court dismisses Trailer Bridge's conversion claim.

**C.    *Damages***

Given the findings of fact and conclusions of law in this opinion, the Court hereby finds the damages as follows:

---

[99] Thomas J. Schoenbaum, *Admiralty and Maritime Law* § 5:3 (6th ed., Nov. 2024 update) (Westlaw) (citing *The Lydia* (*Hugh D. MacKenzie Co. v. Steamship Lydia*), 1 F.2d 18 (2d Cir. 1924)).

[100] *Goodpasture, Inc. v. M/V Pollux*, 602 F.2d 84, 87 (5th Cir. 1979) (citing *Bankers Life Ins. Co. v. Scurlock Oil Co.*, 447 F.2d 997, 1004 (5th Cir. 1971) (applying Texas law)).

1.    **LIM's Unpaid Invoices**

First, LIM prays for judgment *in rem* against the ATLANTA BRIDGE in the amount of $889,575.73, and against the MEMPHIS BRIDGE in the amount of $1,028,219.99, plus interest.[101] Based on the invoices presented at trial,[102] the Court finds that LIM is entitled to judgment *in rem* against the ATLANTA BRIDGE in the amount of $630,402.10, and against the MEMPHIS BRIDGE in the amount of $863,162.50 for towage services provided from January 16, 2021 through June 18, 2021. The Court further finds that LIM is not entitled to judgment against the barges for fuel and lube costs. Fuel may qualify as a "necessary" to a vessel under CIMLA when it is supplied to refuel that vessel.[103] It is undisputed that barges do not consume fuel. As such, LIM is not entitled to costs for fuel and lube. The amount of damages is calculated as follows:

| Invoice No. | Date Range | Tugs | Towage Total (La Invader) | Towage Total (La Commander) |
|---|---|---|---|---|
| 12590 | Jan 16-31, 2021 | La Invader & La Commander | $56,562.50 | $56,562.50 |
| 12593 | Feb 1-15, 2021 | La Invader & La Commander | $82,500.00 | $82,500.00 |
| 12594 | Feb 16-28, 2021 | La Invader & La Commander | $71,500.00 | $71,500.00 |
| 12601 | Mar 1-15, 2021 | La Invader & La Commander | $82,500.00 | $82,500.00 |
| 12602 | Mar 16-31, 2021 | La Invader & La Commander | $88,000.00 | $88,000.00 |
| 12615 | Apr 1-15, 2021 | La Commander | $0 | $85,300.00 |
| 12616 | Apr 1-15, 2021 | La Invader | $85,300.00 | $0 |
| 12606 | Apr 16-30, 2021 | La Invader & La Commander | $93,000.00 | $93,000.00 |
| 12607 | May 1-15, 2021 | La Invader | $93,000.00 | $0 |
| 12621 | May 1-12, 2021 | La Commander | $0 | $71,039.60 |
| 12625 | May 16-18, 2021 | La Invader | $18,600.00 | $0 |
| 12626 | May 19-28, 2021 | La Invader | $62,000.00 | $0 |
| 12632 | May 29-Jun 4, 2021 | La Invader | $43,400.00 | $0 |
| 12635 | June 5-11, 2021 | La Invader | $43,400.00 | $0 |
| 12636 | June 12-18, 2021 | La Invader | $43,400.00 | $0 |
| | | | $863,162.50 | $630,402.10 |

Trailer Bridge argues that the CIMLA only provides for maritime liens for towage, and the day-rate invoiced by LIM includes times in which the barges were not being towed, for example,

---

[101] Rec. Doc. 5 at 11.

[102] Defendant's Exhibit 3.

[103] *Martin Energy Servs., L.L.C. v. Bourbon Petrel M/V*, 962 F.3d 827, 831 (5th Cir. 2020).

stand-by time. The Fifth Circuit instructs courts to "apply the provisions of CIMLA *stricti juris* to ensure that maritime liens are not lightly extended by construction, analogy, or inference."[104] Necessaries "includes most goods or services that are useful to the vessel, keep her out of danger, and enable her to perform her particular function. These are items useful to vessel operations and necessary to keep the ship going."[105] "Necessaries are the things that a prudent owner would provide to enable a ship to perform well the functions for which she has been engaged."[106] Courts look to the "particular function" and requirements of a ship to determine what is a necessary for that ship.[107]

Towage is traditionally defined as the act of assisting a vessel in moving from one place to another.[108] However, Trailer Bridge has not provided any authority that states stand-by time is not lienable under the CIMLA, nor can the Court locate any such authority. To the contrary, in *Trico Marine Operations*, the district court found that stand-by time was lienable.[109] In that case, the contract between the parties explicitly included stand-by time. While the Trailer Bridge/Work Cat charter agreement here does not explicitly reference stand-by time, LIM's tugboats, like the vessels in *Trico Marine,* manned the barges and could not perform work for any company other than Work Cat during the periods charged. The provisions of the charter agreement and the agreed upon day

---

[104] *Valero Mktg. & Supply Co. v. M/V Almi Sun, IMO No. 9579535*, 893 F.3d 290, 292 (5th Cir. 2018) (internal quotations omitted).

[105] *Martin*, 962 F.3d at 831 (internal quotations omitted).

[106] *Equilease Corp. v. M/V Sampson*, 793 F.2d 598, 603 (5th Cir. 1986) (en banc).

[107] *Martin*, 962 F.3d at 832–33. *See also Equilease*, 793 F.2d at 603 ("What is a 'necessary' is to be determined relative to the requirements of the ship.").

[108] 46 C.F.R. § 136.110; *Cont'l Ins. Co. v. L&L Marine Transportation, Inc*., 882 F.3d 566, 570–71 (5th Cir. 2018); *Sacramento Nav. Co. v. Salz*, 273 U.S. 326, 328, 47 S. Ct. 368, 369, 71 L. Ed. 663 (1927) ("Towage service is the employment of one vessel to expedite the voyage of another.").

[109] *Trico Marine Operations, Inc. v. Falcon Drilling Co.,* 1996 WL 96883 (E.D. La. 1996).

rate clearly envision that the towage services would necessitate both transit time and standby time. Further, as stated above, necessaries "includes most goods or services that are useful to the vessel, keep her out of danger, and enable her to perform her particular function. These are items useful to vessel operations and necessary to keep the ship going."[110] During the disputed stand-by periods, the barges were kept out of danger, and the stand-by periods were necessary for the performance of the underlying liner services. During stand-by periods, the tugboat and crew are typically waiting for cargo to be loaded or unloaded, waiting for weather delays, unsafe conditions, or traffic control delays. In any event, it would be virtually impossible for the Court to separate the periods of transit from the stand-by periods based on the day-rate included in the invoices. For these reasons, the Court must reject Trailer Bridge's argument.

### 2.    Pre-judgment and Post-judgment Interest

"As a general rule, prejudgment interest should be awarded in admiralty cases."[111] The "[d]iscretion to deny prejudgment interest is created only when there are 'peculiar circumstances' that would make it inequitable for the losing party to be forced to pay prejudgment interest."[112] Here, there are no peculiar circumstances that would make it inequitable for Trailer Bridge to pay prejudgment interest. Therefore, LIM is entitled to prejudgment interest.

"Prejudgment interest should commence from the date of loss, i.e., the date the invoice[] became overdue."[113] "Admiralty courts in setting the[] rates [of prejudgment interest] have broad discretion and may look to state law or other reasonable guidelines indicating a fair level of

---

[110] *Martin*, 962 F.3d at 831 (internal quotations omitted).

[111] *Noritake Co. v. M/V Hellenic Champion*, 627 F.2d 724, 728 (5th Cir. 1980).

[112] Id. at 728–29.

[113] *ING Bank, N.V. v. M/V Charana Naree,* 446 F. Supp. 3d 163, 177 (W.D. La. 2020).

compensation."[114] Given that this Court sits in Louisiana, the Court will apply the Louisiana prejudgment interest rate, which is currently set at 8.25% per year.[115] Prejudgment interest will commence from the date of the last invoice, June 18, 2021. Finally, post-judgment interest shall be assessed as provided in 28 U.S.C. § 1961.

### 3.    Attorney's Fees

Pursuant to 46 U.S.C. § 31343(c)(2), "[t]he court may award costs and attorneys fees to the prevailing party, unless the court finds that the position of the other party was substantially justified or other circumstances make an award of costs and attorneys fees unjust." The Court finding no circumstances which would make an award of costs and attorneys fees unjust, awards the prevailing party, LIM, attorney's fees and costs.

---

[114] *Reeled Tubing, Inc. v. M/V Chad G*, 794 F.2d 1026, 1028 (5th Cir. 1986).

[115] The Louisiana rate of legal interest is fixed by Louisiana Revised Statute § 13:4202.

### IV. Conclusion

Based on the foregoing Findings of Fact and Conclusions of Law,

**IT IS HEREBY ORDERED** that judgment be entered in favor of Defendant Louisiana International Marine and against the MEMPHIS BRIDGE, *in rem,* in the amount of $863,162.50, plus court costs and reasonable attorney's fees.

**IT IS FURTHER ORDERED** that judgment be entered in favor of Defendant Louisiana International Marine and against the ATLANTA BRIDGE, *in rem*, in the amount of $630,402.10, plus court costs and reasonable attorney's fees.

**IT IS FURTHER ORDERED** that Defendant Louisiana International Marine is awarded pre-judgment interest in accordance with Louisiana Revised Statute § 13:4202 from June 18, 2021 to the date of judgment, and post-judgment interest in accordance with 28 U.S.C. § 1961.

**IT IS FURTHER ORDERED** that within fourteen days of this Judgment Defendant Louisiana International Marine must file a motion addressing the amount of attorney's fees to be awarded.

**NEW ORLEANS, LOUISIANA,** this <u>9th</u> day of May, 2025.

**NANNETTE JOLIVETTE BROWN**
**CHIEF JUDGE**
**UNITED STATES DISTRICT COURT**